**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE CROWELL, | ) | CASE NO. 1:22-CV-02140-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BENITA Y. PEARSON |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Steve Crowell ("Mr. Crowell") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

## II.    PROCEDURAL HISTORY

Mr. Crowell filed an application for DIB on June 29, 2020, alleging a disability onset date of July 25, 2013. (Tr. 187-88.)[1] His application was denied initially and upon reconsideration. (Tr. 112-16, 148-66.) Mr. Crowell requested a hearing before an administrative law judge ("ALJ"). (Tr. 36.) On November 12, 2021, an ALJ held a telephone hearing due to the COVID-19 pandemic, during which Mr. Crowell, represented by counsel, and a vocational expert ("VE") testified. (Tr.

---

[1] The administrative transcript ("Tr.") appears in ECF Doc. 5 on CM/ECF.

37, 57-88.) On December 3, 2021, the ALJ issued a written decision finding Mr. Crowell not disabled under the Social Security Act. (Tr. 37-51.) The ALJ's decision became final on September 28, 2022, when the Appeals Council declined further review. (Tr. 1-7.) Mr. Crowell filed a Complaint on November 29, 2022, challenging the Commissioner's final decision. (ECF Doc. 1.) He raises the following assignments of error:

(1) Whether the ALJ erred in the evaluation of Plaintiff's symptoms and their impact on his residual functional capacity.

(2) Whether the ALJ's determination that Mr. Crowell retained a residual functional capacity for light work activity is supported by substantial evidence.

(ECF Doc. 7, PageID#709.)

### III.    BACKGROUND INFORMATION[2]

#### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Crowell was born in 1970, and he was 43 years old on the alleged disability onset date. (Tr. 50.) He completed high school and two years of college, and he has a certification as a Network Engineer. (Tr. 37, 187-88.) His past relevant work was employment as a construction laborer/supervisor and dump truck driver. (Tr. 80.)

#### B.    <u>Relevant Hearing Testimony</u>

##### 1.    *Mr. Crowell's Testimony*

Mr. Crowell first testified about this L2 compression back injury. (Tr. 66.) He stated that though he has healed from this injury and is mobile, he still experiences pain in his back and legs. (*Id.*) He wears a back brace "more than once a week" whenever he must any kind of physical activity. (*Id.*) He does not take any medication for his back injury. (*Id.*)

---

[2] Because Mr. Crowell's merits brief arguments focus upon only his physical impairments, this summary is similarly limited to testimony and evidence regarding Mr. Crowell's physical impairments.

Mr. Crowell also discussed his rheumatoid arthritis at the hearing. (Tr. 67.) He was prescribed hydroxychloroquine and Plaquenil, but his doctor instructed him to stop taking these medications because both caused his heart to race. (*Id.*)  Mr. Crowell testified that his rheumatoid arthritis results in joint pain, back pain, knee pain, aches, and overall fatigue. (*Id.*) He stated that he has joint pain in his knees, fingers, hands, back, wrists, and feet. (*Id.*) Mr. Crowell testified that he addresses this joint pain by sitting down or stopping the task that triggered his pain. (*See* Tr. 67-68.)

Mr. Crowell also testified about his cardiac conditions. (Tr. 68.) He stated that his heart feels like it is skipping and results in heavy sweating and feeling tired. (*Id.*) He is trying to get his heart conditions under control with metoprolol. (Tr. 69.) He testified that he can only stand for about five minutes before he becomes uncomfortable, and he then needs to move and bounce around until the pain subsides. (*Id.*) He further testified that he can walk 20 to 30 minutes while grocery shopping but then needs to sit down due to pain. (Tr. 71.) He said he carries his grocery bags if he is by himself at the grocery store and can carry up to 10 pounds. (Tr. 71-72.) Mr. Crowell also testified that he experiences back pain if he sits too long, so he tries to sit in a chair where he can "push [his] back up [and] take pressures off of it." (Tr. 72.) He testified that he can only sit for 10 minutes before he must move and change positions. (Tr. 73.)

Mr. Crowell described his typical day. He stated that he wakes up, takes his son to school, "tinker[s] around" or rests, does some shopping, picks his son up from school, and spends time with his family in the evening. (Tr. 74.) He defined "tinkering around" as doing small maintenance items around the house, as well as laundry, and household chores. (*Id.*) He testified that when he does laundry he has difficulty bending and lifting to retrieve clothes from the bottom of the washer and getting clothes in and out of the dryer. (Tr. 75.) He reported living on a two-acre property and

said he sometimes mows the lawn on a riding mover, but he must to do it very slowly. (*Id.*) He stated that he has some difficulty doing small maintenance items. (Tr. 76.) Specifically, Mr. Crowell testified that he can hold a hammer or other tools, but sometimes he experiences pain. (*Id.*) He stated that during a typical day he rests for approximately 30 to 40 minutes. (*Id.*)

### 2. *Vocational Expert's Testimony*

The vocational expert ("VE") opined that Mr. Crowell had past relevant work with employment as a construction laborer supervisor. (Tr. 80.) The ALJ first asked the VE whether an individual with Mr. Crowell's age, education, and vocational background could perform work at the light exertional level if the person cannot climb ladders, ropes, or scaffolds; could frequently climb ramps and stairs, balance, stoop, deal, crouch, or crawl; cannot work with hazardous heights or machinery; cannot perform commercial driving; and can perform simple repetitive tasks in a setting with flexible pace of production requirements such as no production line work. (Tr. 81.) The VE opined that this individual could not perform past work, but he could perform work as a food service worker and housekeeper. (Tr. 81-82.)

The ALJ then asked if the same individual's ability to maintain the jobs described would change if the person would need to sit for approximately 10 minutes every hour. (Tr. 82.) The VE opined that an individual that would need to change position every 30 minutes and/or stand or walk for 5 minutes could not perform past work or the jobs opined in the first hypothetical. (Tr. 82-83.) The VE, however, noted that this individual could perform work at the sedentary exertional level as a mail clerk, office helper, and information clerk. (Tr. 83.)

Mr. Crowell's counsel asked the VE if the person from the ALJ's second hypothetical, except limited to occasionally reaching in all directions and pushing and pulling, would be able to

perform the same jobs. (Tr. 84.) The VE opined that all jobs at the light exertional level would be precluded, but this individual could perform work as a bus monitor and usher. (Tr. 84.)

Mr. Crowell's counsel then asked whether an individual could perform the same jobs from the second hypothetical if the individual could only stand for 30 minutes and then would then need to sit for 15 minutes before standing could perform work. (Tr. 85.) The VE opined that this individual could perform work at the sedentary exertional level as a mail clerk, office helper, and information clerk. (Tr. 86.)

The ALJ asked whether it would be a problem is the individual has to be off task. (*Id.*). The VE opined that an individual can be off task for no more than 10% of the time on average to maintain employment. (*Id.*) Mr. Crowell's counsel inquired about an employer's tolerance for absenteeism. (*Id.*) The VE testified that an individual can only incur one absence a month to sustain competitive employment. (*Id.*)

### C. Relevant Non-Medical/Medical Opinion Evidence

#### 1. *State Agency Opinions*

In September 2020, Dr. Mehr Siddiqui, M.D., found that Mr. Crowell could perform light exertional work, but he was limited in his ability to climb, balance, stoop, kneel, crouch, crawl and should avoid all exposure to hazards. (Tr. 94-95.) Specifically, Dr. Siddiqui opined that Mr. Crowell could lift, carry, and pull 20 pounds occasionally and 10 pounds frequently. (Tr. 94.) Dr. Siddiqui further limited Mr. Crowell to standing/walking for no more than six hours and sitting for six hours out of an eight-hour workday. (*Id.*) Dr. Siddiqui also opined that Mr. Crowell should be limited to frequently climbing ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.*)

## 2. *Christopher Dolega, M.D.*

Dr. Dolega, Mr. Crowell's family medicine physician, opined in July 2021 that Mr. Crowell could lift five to ten pounds, sit for one hour without interruption, and rarely climb, balance, stoop, crouch, kneel, or crawl. (Tr. 644-45.) Dr. Dolega further opined that Mr. Crowell would need to change positions as needed; could sit for one hour without interruption; could occasionally reach; and could rarely push/pull, or perform fine or gross manipulation. (*Id*.) Finally, Dr. Dolega opined that Mr. Crowell needed to elevate his legs at will and noted that he experiences moderate pain that would take him off-task, cause absenteeism, and create issues working in extreme heat or cold. (*Id*.)

### D. <u>Relevant Medical Evidence</u>

#### 1. *Back Impairment*

On July 25, 2013, Mr. Crowell sustained a compression fracture in his lumbar spine as a result of a work-related fall. (Tr. 354, 356). He was on the side of a dump truck when another vehicle hit the truck, causing him to fall about nine feet to the ground. (Tr. 354.) The X-rays taken at the time of the injury confirmed an L2 compression fracture involving the anterior column. (Tr. 355, 364.) That same day, Mr. Crowell was released from the hospital; restricted to light duty, walking as tolerated, and no heavy lifting more than five pounds; and given a back brace. (Tr. 355.)

On August 29, 2013, Mr. Crowell saw Dr. Robert Berkowitz for back pain. (Tr. 404.) The lateral x-ray showed Mr. Crowell's lower back compression fracture was "healing very nice[ly]." (Tr. 399.)

## 2. *Knee Impairment and Rheumatoid Arthritis*

On July 14, 2020, Mr. Crowell complained to his family medicine physician, Dr. Christopher Dolega, of bilateral knee pain, radiating leg pain, and "on and off back issues". (Tr. 499.) Upon examination, Mr. Crowell's lungs were normal, he had normal gait, no abnormalities in his legs, and no neurological deficits. (Tr. 501.) Dr. Dolega discussed the possibility of a connective tissue disorder or rheumatoid arthritis and referred Mr. Crowell to Dr. Gheorghe Ignat, a rheumatologist. (Tr. 512-13.)

On August 19, 2020, Dr. Ignat assessed Mr. Crowell's polyarthritis as having many possible causes, such as inflammatory arthritis or rheumatoid arthritis, crystalline diseases, or connective tissues disorder. (Tr. 523.) Mr. Crowell reported years of diffuse joint pain and stiffness, muscle aches, and fatigue, that had worsened over the past few months. (Tr. 523-24.) Upon physical examination, Mr. Crowell demonstrated decreased range of motion in his cervical and lumbar spines, but normal range of motion or extension in his shoulders, elbows, wrists, hands, hips, knees, and ankles. (Tr. 524.) He demonstrated tenderness in his shoulders, hips, knees, and feet. (*Id.*)

Mr. Crowell returned to Dr. Dolega on September 2, 2020. (Tr. 520.) Mr. Crowell denied chest pain, palpitations, or back pain. (Tr. 521.) On examination, Mr. Crowell's lungs sounded normal; his heart was normal; he had full strength and sensation in his arms and legs; normal range of motion in his hips, ankles, shoulders, elbow, and wrists; and negative straight leg raises. (*Id.*) He further displayed normal range of motion in his knees, though they were tender. (*Id.*) He had decreased flexion in his neck and decreased ability to bend in his lower back. (*Id.*) Mr. Crowell was diagnosed with "mild" rheumatoid arthritis, prescribed Plaquenil, and told to improve his diet and exercise more. (*Id.*)

On September 8, 2020, Mr. Crowell again saw Dr. Dolega. (Tr. 560.) Dr. Dolega's treatment notes indicated that Mr. Crowell's "biggest issues" are his back and knee pain and "the incapacity that results the next day from doing activities." (Tr. 560.)

On November 4, 2020, Mr. Crowell had a rheumatology appointment with Dr. Ignat. (Tr. 538.) He denied any cardiovascular, neurological issues, or back pain, but he reported joint stiffness. (Tr. 539.) Upon examination, Mr. Crowell's lungs sounded normal; his heart was normal; he had full strength and sensation in arms and legs; normal range of motion in his hips, knees, ankles, shoulders, elbows and wrists; and negative straight leg raises. (*Id.*) He had decreased flexion in his neck and decreased ability to bend in his lower back. (*Id.*)

### 3. *Cardiac Issues and Sleep Apnea*

On April 2, 2019, Mr. Crowell met with Dr. Naim Farhat, a cardiologist. (Tr. 471.) Dr. Farhat treated Mr. Crowell for severe obstructive sleep apnea and frequent premature ventricular contractions ("PVCs"). (Tr. 468, 471.) Mr. Crowell stated he was doing better with a CPAP machine and his PVCs were "markedly less." (Tr. 468.) He also walked without any difficulty. (*Id.*) Dr. Farhat prescribed metoprolol and recommended exercise and dietary changes to better manage Mr. Crowell's condition. (Tr. 469.)

On July 9, 2019, Mr. Crowell visited Dr. Farhat and was given a 24-hour Holter monitor. (Tr. 422.) He recorded one episode of dizziness and shortness of breath that corresponded with sinus tachycardia and rare PVCs. (Tr. 422-23, 425.) Mr. Crowell reported that he was "working – lifting/carrying/walking." (Tr. 425.) The Holter monitor showed occasional PVCs and premature atrial contractions (PACs). (Tr. 419). Mr. Crowell complained of occasional dizziness and fatigue. (*Id.*) Dr. Farhat recommended increased activity and exercise on a daily basis, and he instructed Mr. Crowell to return for a further work up if he continued to be symptomatic. (Tr. 419-21.)

On October 22, 2019, Mr. Crowell returned to visit Dr. Farhat. He denied any cardiovascular or respiratory symptoms, and he had no episodes of palpitations or PVCs. (Tr. 416.) Mr. Crowell reported ongoing use of his CPAP for severe sleep apnea. (*Id.*) He walked without difficulty but had some neck pain. (*Id.*) Mr. Crowell had normal cardiovascular, pulmonary, and musculoskeletal findings. (Tr. 417.) Dr. Farhat encouraged Mr. Crowell to exercise and improve his diet. (*Id.*)

On April 2, 2020, Mr. Crowell attended a telehealth follow-up cardiac appointment. He reported no cardiovascular or respiratory symptoms. (Tr. 412.) He specifically denied chest pain, shortness of breath, skipped heartbeats, or palpitations. (*Id.*) His pulse and blood pressure were stable, his labs remained unremarkable, and he was using his CPAP without any difficulties. (*Id.*) Dr. Farhat continued Mr. Crowell's medications and scheduled a six-month follow up appointment. (Tr. 495, 497.)

In October 2020, Mr. Crowell saw Dr. Farhat for another follow-up appointment. (Tr. 533.) Mr. Crowell reported no cardiac symptoms (*id.*) and had normal pulmonary, cardiovascular, and musculoskeletal findings. (Tr. 534.)

Mr. Crowell attended another follow-up appointment with Dr. Farhat in December 2020 and reported that he was recently diagnosed with rheumatoid arthritis and  prescribed medication (hydroxychloroquine) that increased his PVCs. (Tr. 573.)  Mr. Crowell's examination showed normal cardiac function, and Dr. Farhat recommended a Holter monitor for extended cardiac monitoring. (Tr. 574.) The results from a 72-hour cardiac monitoring showed "most likely" an atrial flutter. (*Id.*) Mr. Crowell was assessed as having PVCs and recommended low-dose beta blockers. (Tr. 577-78.)

In January 2021, Mr. Crowell reported continued heart palpitations. (Tr. 578.) Dr. Farhat prescribed a low dose beta-blocker and told Mr. Crowell to return after his electrophysiology evaluation. (Tr. 578, 580). On February 1, 2021, Mr. Crowell attended his electrophysiology evaluation with Dr. Barolomeo Giannattasio. (Tr. 583-84.) Dr. Giannattasio opined that Mr. Crowell was experiencing inappropriate sinus tachycardia. (Tr. 583.) He ordered an echocardiogram and treadmill test and prescribed a low dose of Toprol. (*Id.*) The echocardiogram report showed mildly dilated left atrium and an ejection fraction of 60 to 65%. (Tr. 585.) Mr. Crowell's treadmill stress test was abnormal, with mild to moderate partially reversable basal inferior and basal and mid lateral wall defect; mild apical inferior wall myocardial ischemic; and an ejection fraction of 52%. (Tr. 594-95.)

Dr. met with Mr. Crowell on March 10, 2021, to discuss these findings. Mr. Crowell's frequent PVCs appeared to be of left ventricular outflow tract morphology, and the borderline stress test found a small area of mild ischemia. (Tr. 599.) His ejection fraction was normal and the Holter monitor readings found 5% PVCs. (*Id.*) Dr. Giannattasio did not recommend an ablation to eliminate the PVCs because Mr. Crowell tolerated low dose beta blockers well with no symptoms of fatigue; he had no symptoms of heart failure; and his symptoms of arrhythmia were "very mild." (*Id.*) Dr. Giannattasio observed that Mr. Crowell was doing "very well," "feels well when he exercises," and continued Mr. Crowell's medication. (*Id.*)

On September 13, 2021, Mr. Crowell had an echocardiogram and Holter monitor evaluation. (Tr. 663-67, 673-74.) His echocardiogram showed normal left ventricular contractility, normal ejection fraction, and trace-to-mild heart mitral regurgitation (valve closing deficiency). (Tr. 673.) The Holter monitor revealed nocturnal bradycardia, occasional PVCs, and rare PACs.

(Tr. 663-67.) During the time the Holter monitor was present, Mr. Crowell reported no symptoms. (Tr. 663.)

Mr. Crowell then attended his six-month follow-up appointment with Dr. Giannattasio in September 2021. Dr. Giannattasio noted improvement with medical therapy, including a low dose of metoprolol, with a marked reduction of PVCs and PACs on a recent Holter monitor. (Tr. 659.) Mr. Crowell had a normal physical examination. (Tr. 660.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Crowell met the insured status requirements of the Social Security Act through December 31, 2025. (Tr. 39.) The ALJ then determined that Mr. Crowell had not engaged in substantial gainful activity since July 25, 2013. (*Id.*). The ALJ found that Mr. Crowell had the following severe impairments: arthritis in his knees; arthritis in his spine; cardiac arrhythmias; diabetes mellitus; obesity; and anxiety. (*Id.*) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 40-44.) The ALJ also determined that Mr. Crowell could perform work at the light exertional level, except that he cannot climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch, and crawl; can have no exposure to hazardous heights, machinery, or commercial driving; is able to perform simple, repetitive tasks in a setting with flexible pace and production requirements, such as a position without production line work; and can stand 30 minutes at a time but then needs to change positions for five minutes. (Tr. 44.)

The ALJ next determined that Mr. Crowell is unable to perform any past relevant work. (Tr. 49.) The ALJ further determined that transferability of jobs skills is not material to the determination of disability because the Medical-Vocational Rules supports a finding that Mr.

11

Wells is not disabled under the Social Security Act. (Tr. 50.) Considering Mr. Crowell's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Crowell can perform, such as employment as a mail clerk, office helper, and information clerk. (Tr. 50-51.) Accordingly, the ALJ concluded that Mr. Crowell was not disabled within the meaning of the Social Security Act since his application filing date. (Tr. 51.)

## V.     LAW & ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient

evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  Substantial Evidence Does Not Support the ALJ's RFC Assessment That Mr. Crowell Can Perform Work at the Light Exertional Level.

Mr. Crowell raises two assignments of error: (1) the ALJ erred in his evaluation of his symptoms and their impact on his RFC; and (2) the ALJ's RFC determination is not supported by substantial evidence.

#### 1.  *Substantial Evidence Does Not Support the RFC Assessment Because the ALJ Failed to Adequately Consider Mr. Crowell's Rheumatoid Arthritis and Sleep Apnea.*

Mr. Crowell argues that the ALJ failed to properly analyze all of his symptoms. (ECF Doc. 7, PageID#719.) Specifically, he asserts that the ALJ provided a "half-hearted explanation" as to how each of his severe impairments, specifically those dealing with his back and cardiac conditions, lack consistency with the record. (*Id.* at PageID#721.) He contends that the ALJ's explanations do not comply with the Social Security regulations and are inconsistent with case law. (*Id.*) He also argues that the ALJ "cherry picked" findings in the record to reach his conclusion. (*Id.*) In addition, Mr. Crowell argues that the ALJ failed to address Mr. Crowell's pain related to his rheumatoid arthritis and fatigue related to his sleep apnea. (*Id.*) In response, the Commissioner argues that the ALJ properly evaluated Mr. Crowell's subjective symptoms, and that this Court must give great weight and deference to an ALJ's subjective symptom determination. (ECF Doc. 11, PageID#740-44.)

Mr. Crowell further argues that the ALJ's determination that Mr. Crowell was able to perform work at the light exertional level is not supported by substantial evidence. (ECF Doc. 7, PageID#725.) He maintains that the evidence instead demonstrates that he was limited in his ability to stand, walk, lift, push, and pull, rendering him unable to perform work at this exertional level. (*Id.* at PageID#726.)  He further argues that the ALJ's improper assessment of his pain and fatigue symptoms fails to support the ALJ's RFC determination. (*Id.*)  The Commissioner responds that Mr. Crowell's argument is underdeveloped and constitutes a mere invitation for the court to reweigh the evidence. (ECF Doc. 11, PageID#745.) For the following reasons, Mr. Crowell's arguments are well-taken.

As Step Two of the sequential evaluation process, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual

functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Social Security regulations direct that the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

At Step Two, the ALJ determined that Mr. Crowell had non-severe impairments of rheumatoid arthritis and sleep apnea. The ALJ erred, however, in failing to consider whether these conditions imposed any limitations at later steps of the sequential evaluation process. When formulating an RFC, an ALJ "must consider the combined effect of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks and alteration omitted) (citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of *all* his limitations, not just those that are severe.") (emphasis added). This standard recognizes that "the definition of a non-severe impairment contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities," and that "an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment…does not impose *any* work-related restrictions." *Patterson v. Colvin*, No. 5:14-cv-1470, 2015 WL 5560121, at *4 (N.D. Ohio

16

Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-cv-10417, 2015 WL 87617, at *6 (E.D. Mich. Feb. 27, 2015)) (emphasis in original).

The Commissioner does not directly address how the ALJ specifically addressed the limitations that potentially stem from Mr. Crowell's rheumatoid arthritis and sleep apnea. Rather, the ALJ made a boilerplate statement after his Step Two findings that he "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 40.) But the ALJ's decision fails to demonstrate that he adequately considered Mr. Crowell's non-severe impairments.

Specifically, the ALJ did not adequately consider Mr. Crowell's rheumatoid arthritis. The parties do not dispute that the ALJ acknowledged Mr. Crowell's rheumatoid arthritis earlier in his opinion, but the ALJ's decision does not address how the ALJ reached his RFC determination with respect to this impairment. For example, the ALJ acknowledged Mr. Crowell's testimony that he has "joint pain in his knees, fingers, hands, wrists [,] and feet." (Tr. 45.) But the ALJ did not directly discuss (or at least in any clear detail) how these symptoms are not supported by the record. Rather, the ALJ briefly brought up what appears to be a reference to Mr. Crowell's complaints stemming from rheumatoid arthritis in connection to his back injury. Specifically, the ALJ makes a broad general reference in assessing Mr. Crowell's pain complaints regarding his back injury by stating "[t]here are notations in the record of generalized body pain but no treatment for lumbar spine pain." (Tr. 45) The ALJ's only other mention of rheumatoid arthritis was in connection to his cardiac impairments. The ALJ noted that Mr. Crowell's was recently diagnosed with rheumatoid arthritis and his medication gave his arrhythmias. (Tr. 46; *see* Tr. 573.)

Similarly, the ALJ did not adequately consider Mr. Crowell's sleep apnea, and the ALJ's decision does not demonstrate how the ALJ reached his RFC determination with respect to this

impairment. In connection to Mr. Crowell's cardiac impairments, the ALJ's only discussion of sleep apnea was the following statement: "The evidence shows that the claimant's arrhythmias had improved after getting his sleep apnea under control." (Tr. 46.)

In sum, the ALJ's decision fails to explain why no limitations, if any, were imposed by Mr. Crowell's non-severe conditions. Despite a non-severity finding at Step Two, wholly absent from the ALJ's RFC analysis is any specific discussion of Mr. Crowell's sleep apnea and rheumatoid arthritis. The ALJ's decision is thus contrary to controlling law. *See, e.g.*, *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009) ("[O]nce it was determined that Simpson suffered from severe physical impairments, … the ALJ was required to consider the impairments resulting from this condition and her adjustment disorder with anxiety and depression in assessing her RFC. Instead, the ALJ held that 'based on my evaluation of the claimant's mental impairment as not a severe impairment … she does not have any limitations stemming from that mental impairment.' The ALJ's findings is contrary to controlling law."); *Garcia v. Comm'r of Soc. Sec.*, 105 F.Supp.3d 805, 811 (S.D. Ohio 2015) (internal citation omitted) ("In other words, the ALJ found no limitations arising from Plaintiff's mental impairments simply because those impairments were not severe. Such conclusion is error because it conflates the distinct steps of the sequential receive process and fails to reasonably explain the absence of limitations arising from Plaintiff's mental impairments. This error is not harmless."); *Hines v. Comm'r of Soc. Sec.*, No. 1:20-CV-01422-JG, 2021 WL 3057090, at *7 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, 2021 WL 3056316 (N.D. Ohio July 20, 2021) (remanding for ALJ to explicitly discuss omitted condition when crafting the claimant's RFC). As a result, the ALJ's minimal discussion failed to provide a sufficient basis for meaningful judicial review, making it

difficult to ascertain a logical bridge between the evidence and the ALJ's RFC finding. Accordingly, remand is appropriate.

> ### 2. *The ALJ Erred in His SSR 16-3p Analysis Because He Failed to Adequately Consider His Non-Severe Impairments of Rheumatoid Arthritis and Sleep Apnea.*

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with he objective medical and other evidence in the individual's record." *Id.* An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id.* (internal quotations and citations omitted).

Such compelling reason exists here because the ALJ failed to adequately consider Mr. Crowell's subjective complaints of pain and fatigue stemming from his rheumatoid arthritis and sleep apnea in his SSR 16-3p analysis. In formulating the RFC, the ALJ stated that he had considered Mr. Crowell's symptoms and the consistency of his subjective allegations with other evidence of the record. (Tr. 44.) The ALJ then: (1) set forth the two-step framework under SSR 16-3p; and (2) summarized Mr. Crowell's hearing testimony, stating:

> [T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Next, the ALJ recited medical records and opinion evidence regarding, in relevant part, Mr. Crowell's back, knee, and cardiac impairments. (*See generally* Tr. 45-49.)

But the ALJ here failed at the second step in the SSR 16-3p's two-step process because, as discussed above, wholly absent from the ALJ's decision is any specific discussion regarding Mr.

20

Crowell's alleged symptoms stemming from his rheumatoid arthritis or sleep apnea. Proper consideration of Mr. Crowell's conditions may impact the ALJ's evaluation of Mr. Crowell's subjective complaints and statements concerning the intensity, persistence, and limiting effects of his symptoms because an ALJ's credibility analysis is "inherently intertwined" with the RFC assessment. *See Murphy v. Comm'r of Soc. Sec.*, No. 1:15-CV-126-SKL, 2016 WL 29017746, at *10 n.7 (E.D. Tenn. May 18, 2016) (citing *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.")). Thus, I find that Mr. Crowell's argument that the ALJ did not properly consider his symptoms of fatigue and pain in his SSR 16-3p analysis is well-taken. Accordingly, I recommend that the Court remand this decision for further consideration of the impact of Mr. Crowell's rheumatoid arthritis and sleep apnea on the RFC determination.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

Dated: October 30, 2023

*s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the

basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).